UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| PAR 4 TRANSPORT, LLC, Individually and on Behalf of All Others Similarly Situated, | ) Case No. |
| | ) |
| | ) <u>CLASS ACTION</u> |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| NAVISTAR, INC., | ) <u>DEMAND FOR JURY TRIAL</u> |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

**CLASS ACTION COMPLAINT**

## I.     INTRODUCTION AND OVERVIEW

1.     This is a class action lawsuit brought by Par 4 Transport, LLC ("Par 4" or "Plaintiff"), alleging violations of the common law, the uniform commercial code and state consumer laws applicable to the purchase and lease of Navistar, Inc.'s ("Navistar," "Defendant," or the "Company") ProStar® MaxxForce 13-liter diesel engines (hereinafter, the "Defective Engines") installed in its ProStar® series of tractor-trailer trucks during the period of November 1, 2010 through April 30, 2013, inclusive (the "Class Period").  The lawsuit is brought on behalf of all persons and/or entities who were damaged due to diesel engine emission Exhaust Gas Recirculation ("EGR") control failures and other malfunctions that impacted the MaxxForce 13-liter diesel engines installed by Defendant in ProStar® tractor-trailer trucks.  The Defective Engines harmed Par 4 and other members of the Class as a result of the vehicle's experiencing chronic malfunctions and breakdowns, continuing inoperability and inordinate "downtime" that was persistently disruptive to Par 4's business (and that of other similarly situated Class Members), i.e., downtime for excessive, expensive repairs, and concomitant loss of revenue and goodwill resulting from the Defective Engine that caused recurrent downtime for ProStar® trucks.

2.     Navistar – formally known as International Harvester Corporation – manufactured, produced and marketed 13-liter ProStar® MaxxForce diesel-powered tractor-trailer trucks, buses and RVs for sale/lease to persons and entities in the commercial and recreational markets throughout the Class Period.

3.     During the Class Period, Defendant repeatedly marketed the Defective Engines through material omissions and/or materially false and misleading statements to

CLASS ACTION COMPLAINT
File # 7598.01

the consuming public concerning the reliability, durability and endurance of the diesel emission control system of the Defective Engines sold or leased for its ProStar® series of tractor-trailer trucks and associated vehicles. Defendant's marketing misrepresented and omitted material facts about Navistar's ProStar® vehicle sale and warranty coverage for Navistar Defective Engines in sale and lease agreements that included the Defective Engines, including not revealing that the diesel engines supplied by Navistar failed to comply with mandatory regulations and standards required by the United States Environmental Protection Agency ("EPA") for 2010 (and newer) tractor-trailer trucks in accordance with strict EPA emissions standards.

4.       Beginning at a time at least four (4) years earlier, two engine technologies competed to satisfy the 2010 diesel emission standards of the EPA. The EGR (Exhaust Gas Recirculation) process was initiated by Navistar, which championed its superiority in reducing emissions by displacing oxygen to reduce exhaust pollutants while within the engine (*i.e.*, "in-cylinder"). The standard widespread and competing technology was called "Selective Catalytic Reduction ("SCR"), a process that reduced emissions by treating the engine exhaust with a urea-based solution injected into the exhaust-stream and combined with the exhaust after leaving the engine cylinders. Navistar issued numerous press releases touting its superiority and the expectation its process would, and was, revolutionizing the 2010 emission standards through which its technology was able to, <u>and</u> <u>had</u>, accomplished. Navistar represented at key times that its "EGR" technology was compliant with the EPA standards while marketing its vehicles to the consuming public. In truth, by the beginning of the Class Period (November 1, 2010), it was known by top management key personnel in Navistar that its decision to proceed with EGR and

CLASS ACTION COMPLAINT
 File # 7598.01

differentiate its diesel emission control technology was a failure that was willfully and successfully concealed from purchasers and lessees.

5.      While hundreds of millions of dollars were spent by Navistar to develop the "Advanced EGR" engine, the Company was unable to commence filing an application for certification of the subject engines with the EPA at the start of the Class Period – a time 10 months after the EPA standards had become effective.  Instead, to not disrupt the sale of its Defective Engines, Navistar initially used a strategy approved by the EPA to use "credits" previously accrued during earlier times with other engines and, when the credits exhausted, commenced paying a non-compliance fine (of approximately $1,900, rising to $3,775 in October 2012) for each non-conforming diesel engine sold or leased in the continental United States. Thus, by the beginning of the Class Period, Navistar was facing technological and development problems that were extremely serious.

6.      To conceal the above facts from prospective Navistar customers and continue its improper sales process, the Company's then-Chief Executive Officer ("CEO"), Daniel C. Ustian ("Ustian") (having months earlier settled a separate civil fraud action with the United States Securities and Exchange Commission ("SEC") over Navistar's 2007 accounting restatement), repeatedly restated via public disseminations that Navistar had achieved an engineering breakthrough as it had developed an EPA-compliant EGR engine that was ready for submission to the EPA and that certification was forthcoming.  For example, between November 2010 and January 2011, Ustian falsely stated:

- "We're 100% there in terms of our ability to do it [achieve 0.20g NOx] ...."

CLASS ACTION COMPLAINT
File # 7598.01

- "[W]e'll be applying for our 0.2 certification here in the next couple of months."

- "Because of all the anxiety that is out there, we're going to certify that over the next few months here at 0.2 grams ...."

- "Since we were the only ones out there, there is a lot coming at us with this can't work <u>and, of course, now we are out in the marketplace and that's over. That argument is over. We are out there in the marketplace. We are exceeding what we had committed to in terms of performance and fuel economy and all that. So that's over</u>."

- "<u>We will show you that product, by the way, in Melrose Park [Illinois] on the 25th. We will show you the modifications</u>. It won't be a great drama to you because you won't be able to see anything other than - we would be able to show you the data that it meets 0.2 and show you how we are able to meet it."

(Emphasis added.)

7. In fact, the EGR technology was not ready and was not "out there in the marketplace" with a conforming diesel engine. In truth, Navistar would shortly exhaust its EPA "credits" that were used to avoid cessation of sales and would ultimately be forced to adopt the SCR technology used by competitors and persistently denigrated by Navistar management.

8. In July 2012, Navistar formally acknowledged its failure to provide an EPA-compliant EGR engine, announcing that in order to remain in business it was adopting the SCR technology used by its competitors.

9. On August 2, 2012, Navistar issued a press release entitled "Navistar Announces Actions Designed to Enhance Competitive Position, Drive Profitable Growth and Increase Shareholder Value," announcing that it was withdrawing its full-year financial 2012 guidance, as had been provided to the public, until the release of third

fiscal quarter 2012 results in September (Navistar's fiscal year ends October 31st).

10.     The true facts, which were known by Defendant but concealed from the public and prospective and actual purchasers of the Defective Engine during the Class Period were:

(a)     Navistar's method for compliance with EPA guidelines had been a complete failure requiring that Navistar revise its plan to meet emission guidelines, incurring enormous cost.

(b)     Navistar did not timely have engines available to meet the 2010 EPA standards, as it had assured previously, and was left far "behind the curve."

(c)     Navistar's MaxxForce 13-liter diesel engines equipment for its ProStar® tractor-trailer trucks were defective and hastily and imperfectly manufactured, and would thus subject truck owners and lessees using the Defective Engines to substantial "downtime," *i.e.*, periods of inoperability, coupled with extensive repair costs for systemic engine failure related to faulty fuel injectors, EGR valves, cooler and other EGR system components, including the engine's oil cooler, and a blemished turbo charger "system."

(d)     Based on the above, Defendant lacked a basis for selling and/or leasing, *inter alia*, the MaxxForce 13-liter diesel engine in its ProStar® product line.

11.     As a result of Defendant's false statements and material omission of the true facts, Navistar was able to sell and/or lease thousands of MaxxForce 13-liter diesel engines for its ProStar® product line (including sales and leases to Plaintiff) during the Class Period.  Upon Defendant revealing the true condition and limitations of Navistar's

CLASS ACTION COMPLAINT
 File # 7598.01

Defective Engines, purchasers and lessees of the same, whether under Defendant's warranty program or not, were significantly damaged.

## II.   JURISDICTION AND VENUE

12.   This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act 28 U.S.C. §§1332(d), 1446, and 1453 (b).   Plaintiff further alleges upon information and belief, that the cumulative amount in controversy for the class exceeds $5 million.

13.   Venue is proper in this district pursuant to 28 U.S.C. §1391(a) and (c).   A substantial part of the events and/or omissions giving rise to the claims alleged herein occurred within this district.

14.   Navistar maintains its principal executive offices at 2701 Navistar Drive, Lisle, IL 60532. Certain of the acts and conduct complained of herein, including dissemination of materially false and misleading information to prospective and actual purchasers and lessees, occurred in this District.

## III.   PARTIES

15.   Plaintiff Par 4 Transport, LLP ("Par 4") is a limited liability partnership having its principal place of business in Rochester, Washington 98579.   In 2011, Par 4 purchased ten (10) 13-liter MaxxForce diesel engine tractor trailer trucks from Navistar through Navistar's sales agent, Husky Trucks of Seattle, Washington, and leased an additional three (3) 13-liter diesel engine tractor trailer trucks from Navistar through the financing facilities of General Electric Capital Corporation.   Par 4 paid Navistar in excess of $1.4 million for these vehicles.

16.   Defendant Navistar, Inc., a subsidiary of the Navistar International

6

Corporation (formerly known as International Harvester Corporation or "Navistar International"), is a Delaware corporation headquartered in Lisle, Illinois, located within DuPage County, Illinois, which is within the jurisdiction of this Court. Navistar International is a holding company whose subsidiaries and affiliates produce commercial and military trucks, buses, diesel engines, RVs, and chassis, as well as providing parts and services for trucks and trailers.

IV.     **THE EPA EMISSIONS REGULATORY REGIME**

17.     The Clean Air Act Extension of 1970 ("the Act"), 42 USCA §§ 7521–7551, provides the framework for the regulation of emissions from motor vehicles and engines operated in the United States.   Section 7521(a)(1) provides that the Environmental Protection Agency shall by regulation "prescribe . . . standards applicable to the emissions of any air pollutant from any class or classes of new motor vehicles or new vehicle engines  . . . whether such vehicles and engines are designed as complete systems or incorporate devices to prevent or control such pollution." Section 7521(a)(3)(A)(i) further provides:

> [R]egulations under paragraph (1) of this subsection applicable to emissions of hydrocarbons, carbon monoxide, oxides of nitrogen, and particulate matter from classes or categories of heavy-duty vehicles or engines manufactured during or after model year 1983 shall contain standards which reflect the greatest degree of emission reduction achievable through the application of technology which the Administrator determines will be available for the model year to which such standards apply.

18.     Section 7521(m) of the Act provides regulations regarding the use of emission control diagnostics (referred to as "On Board Diagnostics" or "OBD") capable of:

> (A) accurately identifying . . . emission-related systems deterioration or

CLASS ACTION COMPLAINT
 File # 7598.01

malfunction, including, at a minimum, the catalytic converter and oxygen sensor, which could cause or result in failure of the vehicles to comply with emissions standards . . . (B) alerting the vehicle's owner or operator to the likely need for emission-related components or systems maintenance or repair . . . (C) storing and retrieving fault codes . . . and (D) providing access to stored information in a manner specified by the Administrator.[1]

19.    Section 7541(a)(1) of the Act requires that the:

[M]anufacturer of each new motor vehicle and new motor vehicle engine shall warrant to the ultimate purchaser and each subsequent purchaser that such vehicle or engine is (A) designed, built, and equipped so as to conform at the time of sale with all applicable regulations under section 7521 of this title, and (B) free from defects in materials and workmanship which cause such vehicle or engine to fail to conform with applicable regulations for its useful life (as determined under section 7521(d) of this title).

20.    In compliance with the requirements of the Act, on January 18, 2001 (giving manufacturers significant lead time) the "EPA issued its Final Rule-Control of Air Pollution from New Motor Vehicles: Heavy-Duty Engine and Vehicle Standards and Highway Diesel Fuel Sulfur Control Requirements (Final Rule), effective March 1, 2001.[2] The Final Rule in part states:

We are establishing a comprehensive national control program that will regulate the heavy-duty vehicle and its fuel as a single system. As a part of this program, new emissions standards will begin to take effect in model year 2007, and will apply to heavy-duty highway engines and vehicles. These standards are based upon the use of high-efficiency catalytic exhaust emission control devices or comparably effective advanced technologies. Because these devices are damaged by sulfur, we are also reducing the level of sulfur in highway diesel fuel significantly by mid-2006.

---

[1] Subsection (m) provides for OBD on light duty vehicles, but the subsection further states: "The Administrator may, in the Administrator's discretion, promulgate regulations requiring manufacturers to install such on board diagnostic systems on heavy duty vehicles and engines." 40 CFR § 86.007-17.

[2] The 2007 EPA Emission Standard for 2007 and after Heavy-Duty Diesel Engines is at 40 C.F.R. § 86.007-11.

8

CLASS ACTION COMPLAINT
File # 7598.01

66 Fed. Reg. 5002 (Jan. 18, 2001).

21.    The EPA standard heavy-duty, on-highway, diesel emission standard (referred to herein as the "2007 EPA Emission Standard") was promulgated in 2001 so as to "provide engine manufacturers with the lead time needed to effectively phase-in the exhaust emissions control technology that will be used to achieve the emission benefits of the new standard."  *Id*.  In promulgating the 2007 EPA Emission Standard, the EPA found:

> We estimate that heavy duty trucks and buses today account for about one-third of nitrogen oxides emissions and one-quarter of particulate matter emissions from mobile sources. . . . This program will reduce particulate matter and oxides of nitrogen emissions from heavy duty engines by 90 percent and 95 percent below current standard levels, respectively.

*Id*..

22.    The 2007 EPA Emission Standard regulated diesel vehicle/engine emission standards and diesel fuel standards simultaneously, as a single system:

> These options will ensure that there is widespread availability and supply of low sulfur diesel fuel from the very beginning of the program, and will provide engine manufacturers with the lead time needed to efficiently phase-in the exhaust emission control technology that will be used to achieve the emissions benefits of the new standards.

*Id*.

23.    The 2007 EPA Emission Standard imposes not-to-exceed standards for Oxides of Nitrogen ("NOx"); Non-Methane Hydrocarbons ("NMHC"); Non-Methane Hydrocarbon Equivalent; Carbon Monoxide; and Particulate Matter("PM").

24.    The Act requires the EPA to set standards which "reflect the greatest degree of emission reduction achievable through the application of technology . . . available for the model year to which such standards apply."  42 U.S.C.

CLASS ACTION COMPLAINT
File # 7598.01

§ 7521(a)(3).  In that regard, the EPA stated in the Final Rule:

> • [T]he development of diesel emissions control technology has advanced in recent years so that very large emission reductions (in excess of 90%) are possible, especially through the use of catalytic emission control devices installed in the vehicle's exhaust system and integrated with the engine controls. These devices are often referred to as "exhaust emission control" or "aftertreatment" devices. . . . To meet the new standards, application of high-efficiency exhaust emission controls for both PM and NOx will be needed.

66 Fed. Reg. 5007.

> • [S]everal exhaust emission control devices have been or are being developed to control harmful diesel exhaust pollutants. Of these, we believe that the catalyzed diesel particulate trap and the NOx absorber are the most likely candidates to be used to meet the very low diesel exhaust emission standards adopted today.

*Id.* at 5036.

> • Like the PM standard, the new NOx standard is projected to require the addition of a highly efficient NOx emission control system to diesel engines which, with help from the PM trap, will need to be optimized to control NMHC emissions.

*Id.*

> • Un-catalyzed diesel particulate filters will not be able to meet the 0.01 g/bhp-hr PM standard finalized today as they are only moderately effective at controlling the SOF fraction of the particulate. In addition, they require active regeneration technology which must be engaged frequently making the systems expensive to operate (increasing fuel consumption) and less reliable.

*Id.* at 5047.

> • Diesel particulate filters (PM traps) function to control diesel PM through mechanical filtration of PM from the diesel exhaust stream and then oxidation of the stored PM (trap regeneration). Through oxidation in the catalyzed diesel particulate filter the stored carbonaceous PM is converted to $CO_2$ and released into the atmosphere.  Failure to oxidize the stored PM leads to accumulation in the trap, eventually causing the trap to become so full that it severely restricts exhaust flow through the device, leading to trap or vehicle failure... Therefore in order to ensure passive regeneration of the diesel particulate filters, significant amounts of

CLASS ACTION COMPLAINT
File # 7598.01

platinum group metals (primarily platinum) are being used in the wash-coat formulations of advanced diesel particulate filters.

*Id.* at 5057.

• All of the NOx exhaust emission control technologies discussed previously in Section III are expected to utilize platinum to oxidize NO to NO2 to improve NOx reduction efficiency of the catalysts at low temperatures or as in the case of a NOx absorber, as an essential part of the process of NOx storage.

*Id.* at 5059.

• We therefore anticipate that catalyzed diesel particulate filters can be integrated with new diesel engines with only a minimal amount of engine development. We do not anticipate that additional hardware beyond the diesel particulate filter itself and an exhaust pressure sensor for OBD will be required in order to meet the PM standard.

*Id*. at 5091.

• Testing at NVFEL shows yet another engineering path to optimizing the NOx control system external to the combustion system. This approach segregates the exhaust into separate streams external to the engine and manipulates exhaust conditions by changing exhaust mass flow (through valves) and by adding supplemental fuel with an electronic fuel injector."

*Id*. at 5052.

25.     The Final Rule provided that the exhaust emission control necessary for compliance with the emission standards would be a "complete emission control system" integrated with on-board diagnostics:[3]

• The Complete System: We expect that the technologies described above would be integrated into a complete emission control system as described in the final RIA. The engine-out emissions will be balanced with the exhaust emission control package in such a way that the result is the most beneficial from a cost, fuel economy and emissions standpoint.

---

[3] Regulatory Impact Analysis EPA420 -00-010, July 2000, p. 21: Because these future emission control strategies will rely on electronic controls for adequate performance, EPA expected that the best available on-board diagnostics would be implemented to ensure that these strategies remained effective in-use.

11

*Id*. at 5054.

• The manufacturers are expected to take a system approach to the problem of optimizing the engine and exhaust emission control system to realize the best overall performance possible.

*Id*. at 5090.

26. "Reliability" of the exhaust emission control system was defined in the Final Rule as "the expectation that emission control technologies must continue to function as required under all operating conditions for the life of the vehicle." *Id*. at 5056.

27. "Aftertreatment" refers to the treatment process for exhaust, *i.e.*, pollutant reduction after the exhaust leaves the engine. "Regeneration" is the "burning off of collected PM (oxidation of the stored PM, releasing $CO_2$)." *Id*. at 5047.

## V.    BACKGROUND

28. Defendant Navistar , Inc. produces the International® and ProStar® brands of commercial and military trucks equipped with Navistar's MaxxForce® brand diesel engines and provides the parts and services for all makes of the trucks it sells or leases.  Navistar is also a private-label designer and manufacturer of diesel engines for pickup trucks, vans and SUVs, and provides retail, wholesale, and lease financing for trucks and parts. Navistar offers its products and services through dealers and distributors located primarily in the United States, Canada, Mexico, Brazil and Argentina.

29. Prior to the Class Period, Navistar and its competitors focused on developing and perfecting engine technologies to meet the strict EPA emission standards that applied to all 2010 model year trucks and engines. The two engine technologies under development, as stated above, were EGR, a process reducing emissions by

CLASS ACTION COMPLAINT
File # 7598.01

minimizing exhaust pollutants within the engine cylinders (*i.e.*, "in-cylinder"), and SCR, a process reducing emissions by treatment of the engine exhaust with a urea-based chemical outside the engine.

30.     While EGR may have been preferred in theory due to convenience and cost considerations, it quickly was apparent to Defendant that SCR was the only viable means to reach the strict 2010 EPA emission standards (specifically the 0.20g NOx standard.)  Every one of Navistar's meaningful competitors (*i.e.*, Mack, Volvo, Daimler, PACCAR, *etc.*) proceeded to perfect the SCR system and received their EPA certification by the start of the Class Period. Navistar disregarded the prevailing engineering consensus and instead represented that it would develop an EGR engine that would be EPA certified on a timely basis. By the time commencing the Class Period, it was clear to Defendant  that the system by Navistar was not working and could not reasonably comply with EPA standards. Despite the $700 million Navistar spent on developing its proprietary "Advanced EGR" engine, the Company was not able to apply for EPA certification by achieving the 0.20g NOx standard by the start of the Class Period—ten months after the EPA standard became effective.  Rather, in order to continue the sale of its trucks and generate immediate revenue, Navistar sold non-conforming engines by exhausting EPA credits it had previously accrued on smaller engines and, when the credits were exhausted, paid a non-compliance fine to the EPA for each diesel engine sold that failed to meet the new standard.

## VI.     DEFENDANT'S FALSE AND MISLEADING PUBLICITY AND MARKETING DURING THE CLASS PERIOD

31.     On November 3, 2010, Navistar publicly announced that it was positioned to apply to the EPA for certification of its MaxxForce 13 at 0.2g NOx within the next few

CLASS ACTION COMPLAINT
File # 7598.01

months.

32.     On November 3, 2010, Navistar held a press briefing at the Company's Engine Group facility in Huntsville, Alabama. CEO Ustian and other executives were quoted in media articles regarding the strategic importance and <u>imminent</u> success achieved by the Company's 13-liter MaxxForce diesel engines, including its EGR emission controls.

33.     By way of example, on November 4, 2010, *Fleet Owner* published an article entitled "Navistar Says It Has Engines Meeting 2010 Emissions Standard", which in part stated:

> When Navistar announced it was going to meet the Environmental Protection Agency's 2010 emissions mandate with Advanced EGR technology, many said it couldn't be done. Some said Navistar could only satisfy the EPA 2010 emissions standard of 0.2 grams of nitrates of oxide (NOx) through the use of emissions credits that allowed its engines to emit 0.5 grams of NOx.

> According to Dan Ustian, president & CEO, Navistar not only can meet the 0.2 NOx level without credits, but customers are warming to its distinct engine solution.

> <u>"We're 100% there in terms of our ability to do it</u>," Dan Ustian, chairman & CEO of Navistar said at a press briefing on Wednesday at the company's Engine Group facility in Huntsville, AL. <u>"It's really nothing to do with the technology anymore, it's [customer] experience.</u> They don't have any experience with the engine."

> Ramin Younessi, group vice president-product development & strategy, told Fleet Owner that engines meeting the 0.2 limit without credits will be submitted to EPA for certification "within the next few months."

(Emphasis added.)

34.     On November 4, 2010, *Today's Trucking* similarly published an article entitled "Navistar: NOx-Compliant Engine Achieved", reinforcing Navistar's compliance message:

CLASS ACTION COMPLAINT
File # 7598.01

Navistar International says it is on the verge of submitting for certification a MaxxForce 13 engine that finally meets the EPA's 0.2g NOx standard, but it will continue selling engines that exceed that EPA limit until its banked emissions credits run out.

Navistar - the sole heavy-duty engine maker to go with an advanced version of the 2007 EGR system rather than SCR technology - announced it will for the first time submit to EPA 0.2g NOx-compliant engines, `far ahead of when high volume production of the 0.2g NOx-certified MaxxForce 13 would be required."

During the tour, Dan Ustian, Chairman & CEO said the new generation, 0.2g NOx-compliant models improve on fuel economy. They will be submitted to the EPA in the next few months.

***

When asked for details before this posting, Navistar spokesman Roy Wiley would only confirm in an email that the "0.2g NOx MaxxForce 13 we mentioned in the release yesterday and plan to submit to the EPA for certification will achieve emissions 'in-cylinder.' Stay tuned."

35.    On November 5, 2010, Truck News published an article entitled "Navistar

nearly ready to certify International MaxxForce at 0.2 g NOx," which stated in part:

Navistar International will soon certify its heavy-duty engines at 0.2 g/hp-hr NOx but it will not roll those engines out to industry for as long as possible, until it has exhausted its collection of emissions credits.

During a recent tour of the company's Huntsville, Alabama big bore engine plant, Navistar chairman, president and CEO Dan Ustian told media that the company will certify its engines at 0.2 g NOx so the industry has the peace of mind of knowing it is possible.

"Because of all the anxiety that is out there, we're going to certify that over the next few months here at 0.2 grams," he said, adding the company will then continue selling engines at today's 0.5 g NOx level "as long as we can," so customers will not have to endure another engine change so soon. The 0.2 g NOx engine won't be drastically different from today's, Ustian noted, but will require new algorithms and enhancements to fuel pressure and air management systems.

***

"There is this (perception) that when you go to 0.2, you're going to lose fuel economy," Ustian said. "We'll be able to show you that it's better fuel economy (at 0.2 g) just because of improvements in the technology."

15

CLASS ACTION COMPLAINT

File # 7598.01

36.     On April 5, 2011, Navistar issued a press release entitled "Navistar Receives EPA Certification for MaxxForce DT Mid-Range Diesel Engine At 0.39G NOx - With EPA and CARB Certification of MaxxForce® 15, Submission of MaxxForce® 13 at 0.2g NOx, Company Continues to Make Strides in Its In-Cylinder Emissions Technology Path," which in part stated:

> MaxxForce 13 at 0.2g NOx Submitted to EPA
>
> In addition, Navistar also recently submitted its MaxxForce 13 at 0.20g NOx for EPA certification, once again reiterating its prime technology path in meeting the 0.20g NOx standard through in-cylinder technologies. The company intends to phase-in its engines at progressively lower NOx emissions levels (0.4g NOx, 0.35g NOx, 0.3g NOx, 0.25g NOx, etc.) in the years ahead in an effort to make emissions compliance as seamless as possible to its customers.
>
> "During the past several years, while other OEMs were producing engines at or above the required emissions standard, Navistar produced engines much cleaner than the standard, in turn, generating credits that today provide us with the flexibility needed to develop the most customer-focused emissions technologies in the industry," Younessi added. "Our MaxxForce Advanced EGR in-cylinder emissions technology remains the only solution in compliance with EPA standards at the turn of the key, without the need for aftertreatment and without customers having to find and fill liquid urea for their SCR systems."

(Emphasis added.)

37.     The Company's public filings, press releases and advertisements concerning the touted imminent success by Navistar to provide its 13-liter MaxxForce diesel engine with EPA compliance (together with its misleading vehicle warranty representations) induced Plaintiff and other Class Members to purchase and/or lease the ProStar® tractor-trailer trucks instead of similar trucks having the SCR emission control system. Absent the improper, deceptive and misleading marketing and public statements by Navistar, Plaintiff and the other members of the Class would not have purchased or leased the Navistar vehicles.

CLASS ACTION COMPLAINT
File # 7598.01

38.     Shockingly, on July 6, 2012, Navistar announced that it was abandoning its Advanced EGR engine technology and adopting the same SCR technology of its rivals, doing so to eventually satisfy 2010 EPA emissions standards. The release in part stated:

> Navistar International Corporation today announced that it will introduce its next generation clean engine solution - In-Cylinder Technology Plus (ICT+) - to meet 2010 U.S. Environmental Protection Agency (EPA) emissions regulations and position the company to meet greenhouse gas (GHG) rules in advance of 2014 and 2017 requirements. The ICT+ technology combines Navistar's advanced in-cylinder engine expertise with urea-based aftertreatment and is expected to be available beginning early 2013.

39.     Documentation provided by the EPA and, similarly, a D.C. Court of Appeals opinion made available in 2012, demonstrate that, in fact, Navistar had never, not at any time, achieved an EPA-compliant 0.20g NOx EGR engine and had never applied for EPA certification before January 31, 2012!  Even then, Navistar's January 2012 application extended only to one (1) of its six (6) engine families.  The January 2012 submission was inundated with critical problems of such magnitude that the EPA returned the engine to Navistar, which, thereafter, withdrew its application altogether!

40.     At a September 28, 2012 Company event, following the firing of key members of senior management, Jim Hebe, Navistar Senior Vice President, acknowledged: "We have got the right emissions strategy, finally. . . . The public will see a more upfront approach from Navistar. . . . We're through with the B.S.," he said. "We've had enough of it the past three years."  During the Class Period, the Plaintiff's, the Class's, and all ProStar® tractor-trailer vehicles were equipped exclusively with defective 13-liter MaxxForce diesel engines.

41.     The true facts, which were known by Defendant but concealed from the

CLASS ACTION COMPLAINT
 File # 7598.01

public during the Class Period, were:

> (a)    Navistar's attempted methods to achieve compliance with EPA guidelines controlling the subject diesel engines had failed, the engines did not work, and Navistar would be forced to revise its plan to meet the guidelines;

> (b)    Navistar did not have engines ready for installation on the ProStar® series that met 2010 EPA standards;

> (c)    Navistar knew that its Maxx Force 13-liter diesel engines for its ProStar® line of tractor-trailer trucks persistently suffered performance and durability disabilities that were, and would, cause substantial "downtime" of the vehicles due to recurring repairs that rendered these vehicles unfit for their intended use, caused substantial damage to purchasers' and lessees' businesses and rendered the vehicles un-merchantable; and

> (d)    As a result of the above information, Plaintiff and other members of the Class also lost substantial resale value of their ProStar® tractor-trailer trucks.

## VII.    PLAINTIFF'S EXPERIENCE WITH PROSTAR® TRUCKS EQUIPPED WITH DEFECTIVE ENGINES

42.    Par 4 purchased at least ten (10) ProStar® tractor-trailers in Washington having the 13-liter MaxxForce diesel engines manufactured by Navistar. These Defective Engines chronically and repeatedly suffered performance and reliability problems, commencing immediately. The precise date and VIN number for the purchased vehicles is on Exhibit "A," attached hereto and incorporated herein by reference. In addition, Par 4 leased three (3) ProStar® tractor-trailer trucks equipped with the Defective Engines. These vehicles, without exception, suffered recurring

CLASS ACTION COMPLAINT
File # 7598.01

performance and reliability problems that resulted in substantial downtime and an exorbitant increase in maintenance and repair costs when Defendant refused responsibility for repairs.

43.     Each of Plaintiff's vehicles was covered by a 5-year/100,000 mile written warranty.  The Defective Engines caused all the Navistar trucks to persistently be disabled, manifest poor acceleration, provide inadequate air conditioning performance, experience an inability to handle lengthy periods of engine idle, provide rough idle, chronic difficulty in starting the engine, instances of the engine not starting, chronic engine stall, and the loss of power during driving activities. These disabilities were the result of engine defects.

44.     Plaintiff repeatedly complained to Navistar about the aforementioned engine characteristics and demanded repair of the vehicles.

45.     Navistar responded by refusing to repair the engines or initiate a responsive effort to repair the engines.  Navistar failed to provide the promised warranty benefits for Plaintiff's vehicles despite the continuing demand by Plaintiff and notwithstanding the grave need for repairs, the same within the warranty's time and mileage eligibility.

46.     Despite Plaintiff's repairs and increased efforts to monitor and maintain the Defective Engines, the engines continued to malfunction and Plaintiff repeatedly was requested to bring the malfunctioning vehicles to an authorized Navistar dealership for repairs.  At all relevant times, Navistar refused to perform an adequate, suitable or capable repair and/or refused to provide repair services of any sort or type.

47.     Despite knowing that Plaintiff and the members of the Class had bought

19

ProStar® vehicles outfitted with Defective Engines that failed to perform wholly, or in substantial part, Navistar responded by authorizing minor recalibrations, adjustments and replacement of isolated components that Navistar knew would not repair the engines or its related components.

48.     As a result of Navistar's failure to properly or adequately repair Plaintiff's Defective Engines during the warranty period, Plaintiff reasonably incurred repair expenses responsive to these issues, lost income resulting from unavailability of the vehicles, lost customer goodwill, and/or suffered other direct and consequential damages, including reputational damages.

49.     Diesel technicians working on Plaintiff's vehicles at Navistar dealerships have repeatedly acknowledged the high and unusual volume of problems inherent in the Defective Engines.

50.     At the time Plaintiff and Class members purchased or leased the Defective Engines, Navistar had and has actual knowledge of the detailed defects of the Defective Engines complained of and asserted by Plaintiff and members of the Class, as well as the continuing claims and demands by Plaintiff to Navistar for repair of the defects.  Plaintiff at all relevant times notified Navistar, either directly or through Navistar dealerships, of the above issues, described the numerous defects and problems resulting from the Defective Engines, and provided Navistar with numerous opportunities to properly repair or replace the Defective Engines of Plaintiff and the members of the Class.

## VIII.   CLASS ACTION ALLEGATIONS

51.     Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action for itself and on behalf of the Class, defined as follows:

CLASS ACTION COMPLAINT
File # 7598.01

1.      **Purchaser Class**.  All entities and natural persons in the United States (including its Territories and District of Columbia) who, between at least November 1, 2010 and April 30, 2013, purchased a ProStar® vehicle equipped with a MaxxForce 13-liter diesel engine and that was subject to one or more engine repairs that were covered by Navistar's New Vehicle Limited Warranty during the vehicle's initial five years of service or 100,000 miles, whichever came or comes first, that related to the vehicle's fuel injector, EGR valve, cooler or other EGR system components and/or the cooler and/or the turbo charger of the vehicle.

2.      **Lessee Subclass**.  All entities and natural persons in the United States (including its Territories and District of Columbia) who, between November 1, 2010 and April 30, 2013, leased a ProStar® vehicle equipped with a MaxxForce 13-liter diesel engine and that was subject to one or more engine repairs that were covered by Navistar's New Vehicle Limited Warranty during the vehicle's initial five years of service or 100,000 miles, whichever came or comes first, that related to the vehicle's fuel injector, EGR valve, cooler or other EGR system component and/or the oil cooler and/or the turbo charger of the vehicle.

3.      Excluded from the Purchaser Class are: (a) all federal court judges who have presided over this case and their spouses and anyone within three degrees of consanguinity from those judges and their spouses; (b) all entities and natural persons who elect to exclude themselves from the Class; (c) all entities and natural persons who (i) prior to the filing of the Motion for Preliminary Approval filed an individual lawsuit (*i.e.*, a lawsuit that does not seek certification as a class action) in any court asserting causes of action of any nature, including, but not limited to, claims for violations of federal, state or other law (whether in contract, tort or otherwise, including statutory and injunctive relief, common law, property, warranty and equitable claims) based upon the MaxxForce 13-liter diesel engine in a class vehicle, and (ii) have not voluntarily dismissed such lawsuit without prejudice; and (d) Defendant's employees, officers, directors, agents, and representative and their family members.

CLASS ACTION COMPLAINT

File # 7598.01

### A.    Fed. R. Civ. P. 23(a) Prerequisites

52.    The Purchaser Class and Lessee Subclass are so numerous that joinder of all members is impracticable.[1]  At this time, Plaintiff does not know the exact size of the Class.  Based on information and belief, the Class is comprised of at least thousands of members (the "Class Members") and is geographically dispersed throughout the country as to render joinder of all Class Members impracticable.

53.    The claims of Plaintiff and the Class Members involve common questions of fact and law that predominate over any individual issues.  These common issues include, but are not limited to:

a.    Whether the MaxxForce 13-liter diesel engines sold or leased by Defendant were defective so as to make the vehicles unable to withstand reasonably anticipated use;

b.    Whether the implied warranty of merchantability applies to the Plaintiff and the Class relative to the MaxxForce 13-liter diesel engines;

c.    Whether Defendant breached the implied warranty of merchantability with respect to the MaxxForce 13-liter diesel engines;

d.    Whether Defendant made express warranties regarding its MaxxForce 13 engines, including the warranty that Defendant, through its authorized dealerships, would, without charge, repair, replace or adjust all parts that malfunctioned or failed during normal use during the applicable coverage period due to a defect in factory-supplied materials or factory workmanship, or otherwise.

e.    Whether Defendant breached its express warranty regarding its MaxxForce 13-liter diesel engines when it failed to adequately repair the defects;

f.    Whether Defendant knew, or reasonably should have known, about the MaxxForce 13-liter diesel engine defect or any defective

---

[1] Unless separately material to the claims asserted against Navistar in this Complaint, the Purchaser Class and Lessee Subclass are jointly referred to as the "Class."

CLASS ACTION COMPLAINT

File # 7598.01

component;

g.     The time(s) Defendant became aware of the MaxxForce 13-liter diesel engine defects;

h.     Whether Defendant acted improperly by failing to disclose the MaxxForce 13-liter diesel engine defects to prospective and/or former purchasers or lessees and the related timeframe covered thereby;

i.     Whether Defendant concealed the MaxxForce 13-liter diesel engine defects and improperly created a false impression of, *inter alia*, reliability and capabilities to induce sales of ProStar® tractor-trailer vehicles both sold and leased to Plaintiff and members of the Class during the Class Period or otherwise;

j.     Whether Defendant had and/or continues to have a duty to disclose the MaxxForce 13-liter diesel defects and respond to the loss, costs, damage and expense caused by Defendant's misconduct;

k.     Whether the defective nature of the MaxxForce 13-liter diesel engines constitutes a material fact and/or material breach; and

l.     Whether Defendant violated consumer protection statutes, or other statutes and the appropriate remedy owed Plaintiff and the members of the Class.

54.     The claims of Plaintiff are typical of the other Class Members' claims. As described above, Defendant expressly warranted to Plaintiff and all Class Members that it would, without charge, repair, replace or adjust all parts that malfunctioned or failed during normal use during the applicable coverage period due to a defect in factory-supplied materials or factory workmanship.

55.     Defendant uniformly breached its express warranty (and otherwise) to Plaintiff and Class Members by failing to repair, replace or adjust defective parts, and/or initiate a suitable program addressing the continuing consequence of Defendant's misconduct to Plaintiff and the Class.

56.     Defendant uniformly breached the implied warranty of merchantability to

Plaintiff and the Class because the Defective Engines were inadequate and incapable of reliably performing the tasks they were designed to carry out as reasonably expected by purchasers and lessees of the Defective Engines.

57.     Plaintiff, like other members of the Class, used its vehicles in the normal manner for which the MaxxForce 13-liter diesel engines were designed and marketed. Notwithstanding Plaintiff's proper use of the engines, Defendant's engines malfunctioned and, in response, Defendant failed or refused to repair such malfunctions by replacing, adjusting or repairing the engines despite knowing that the engines' reliability was chronically impaired.

58.     Because of the defects now acknowledged by Navistar, Plaintiff and Class Members' engines continue to malfunction during the course of normal use due to the Defective Engines and/or factory workmanship.

59.     Plaintiff and the members of the Class purchased and leased ProStar® vehicles by Navistar that included the Defective Engines.  Plaintiff, like all the Class Members, has been damaged by Navistar's misconduct.  Further, the factual basis of Navistar's misconduct is common to all Class members with regard to the Defective Engines.   At all relevant times, Navistar made uniform misrepresentations to and withheld material information from Plaintiff and the remainder of the Class.

60.     Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is a member of the Class.  Plaintiff's interests coincide with and are not antagonistic to other Class Members' interests.   Additionally, Plaintiff has retained counsel experienced and competent in complex, commercial, multi-party, mass tort, consumer and class action litigation.  Plaintiff's counsel has prosecuted complex class

CLASS ACTION COMPLAINT
File # 7598.01

actions in state and federal courts across the country.

**B.    Fed. R. Civ. P. 23(b) Prerequisites**

61.    Questions of law and fact common to the Class predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.   Individual damages on the matter can be readily calculated by documented income loss and expenses caused by the defects placed at issue by this Complaint. The question of damages as to a particular Class member will not predominate over legal and factual questions common to the Class.   Navistar has acted or refused to act on grounds that apply to the entire Class so that injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

**IX.    CAUSES OF ACTION**

**COUNT ONE**

**BREACH OF IMPLIED WARRANTY**

62.    Plaintiff and Class Members incorporate by reference paragraphs 1–61 set forth above as though fully set forth herein.

63.    Plaintiff and members of the Class purchased or leased vehicles from Defendant Navistar that were equipped with MaxxForce 13-liter diesel engines.

64.    The MaxxForce 13-liter diesel engines left Navistar's possession in unmerchantable condition. Plaintiff and Class Members used their vehicles under circumstances in the normal manner for which the subject engines were designed. Despite Plaintiff's (and the other Class Members') proper use, the engines persistently malfunctioned in a manner that Defendant refused to address by repairing, replacing or

CLASS ACTION COMPLAINT
 File # 7598.01

adjusting such engines, or otherwise.

65.     The MaxxForce 13-liter diesel engines marketed and sold by Navistar were inadequate and incapable of performing the tasks they were designed to carry out and for which they were marketed.  The Defective Engines exhibit symptoms including but not limited to:

a.      Engines are not able to withstand extended periods of engine idle;

b.      The subject engines have deficient acceleration;

c.      The subject engines repeatedly stall;

d.      The subject engines frequently fail to start;

e.      The subject engines are difficult to start, then run roughly;

f.      The subject engines require prolonged periods of time to acclimate and "warm-up" before acceleration is possible;

g.      The subject engines include fuel injectors that are prone to persistent failure;

h.      The subject engines' EGR valve, cooler and other EGR system components are prone to failure; and

i.      The subject engines' oil coolers and turbo chargers are also prone to failure.

66.     After having the subject vehicles repaired repeatedly, Plaintiff notified Navistar of the breach of warranty claims when they brought their vehicles to a Navistar dealership, as described above.  Plaintiff contacted its local Navistar dealerships and/or informed a Navistar representative of the continuous, abnormal malfunctions of the MaxxForce 13-liter diesel engine design and tolerated repeated unsuccessful and hapless attempts by Navistar dealerships to repair the problems.

67.     Navistar had actual knowledge of the specific symptoms associated with

CLASS ACTION COMPLAINT
File # 7598.01

the Defective Engines and the problems resulting therefrom, including as experienced by Plaintiff.

68.     Navistar has neither adequately or suitably cured the engine defects, replaced the Defective Engines, or proposed a method or manner to make Plaintiff and the members of the Class whole.

69.     As a result of Navistar's breach of implied warranty of merchantability, Plaintiff has suffered damages in an amount being the difference between the value of the vehicles equipped with the Defective Engines and the value of the vehicles if they had performed as warranted.

70.     Plaintiff also suffered diminution in the value of its Class vehicles, out-of-pocket cost and expenses related to the repair/service of the MaxxForce 13-liter diesel engines (including deductibles paid when repairs were covered by insurance, and the full cost of repair when they were not covered), lost profits from an inability to use the defective vehicles (caused by the long delays as Navistar dealership mechanics repeatedly and unsuccessfully attempted to diagnose and/or repair the defects), towing charges incurred due to the repeated vehicle breakdowns, the cost of purchasing additional vehicles to compensate for the chronic problems with reliability of the MaxxForce 13-liter diesel engines, and other damages as described herein.

71.     Defendant Navistar's defective MaxxForce 13-liter diesel engine was the direct and proximate cause of Plaintiff's injury.

## COUNT TWO

## BREACH OF EXPRESS WARRANTY

72.     Plaintiff incorporates by reference paragraphs 1–61 set out above as

27

though fully set forth herein.

73.     Navistar provided Plaintiff with an express limited warranty covering the MaxxForce 13-liter diesel engines.  The warranty extends to the engine and engine components for defects in the factory-shipped materials or workmanship of vehicles sold for five years after the warranty commenced or 100,000 miles, whichever occurs first, and further provided that during the period of coverage by the warranty, an authorized Navistar dealer would repair, replace or adjust all defective parts of the Navistar vehicles relative to factory-supplied materials and workmanship.

74.     This warranty was a part and a basis for the bargain by purchasers/lessees with Navistar.

75.     Navistar manufactured and sold vehicles equipped with the subject engines covered by the express warranty.

76.     Navistar breached this express warranty to Plaintiff and each member of the Class when (1) its dealerships failed to properly repair, replace or adjust the malfunctioning engine and thus failed to return the vehicle to the vehicle owner in proper working condition, and (2) when Defendant refused to authorize Navistar dealerships to perform suitable, proper or adequate repairs of a vehicle, only authorizing insufficient and inadequate repair that caused the need for further or additional engine repair or replacement, including at times after expiration of the warranty period.

77.     Navistar had knowledge of the engine defects that chronically afflicted the MaxxForce 13-liter diesel engine and the problems resulting.

78.     Plaintiff notified Navistar of the breach of the warranty within a reasonable time and/or was not required to do so because affording Navistar repeated

CLASS ACTION COMPLAINT

File # 7598.01

opportunity to cure its breach of written warranty was shown to have been futile. Following attempts to have the subject vehicles repaired repeatedly, Plaintiff placed Defendant on notice of the breach of warranty claims by Plaintiff when it placed its vehicles in a Navistar dealership and/or repair facility and/or contacted Navistar directly, as described above. On numerous occasions, Plaintiff contacted the involved Navistar dealerships and/or informed a Navistar representative of the continuous malfunctions of the MaxxForce 13-liter diesel engine design and repeated unsuccessful attempts by Navistar to repair the vehicles. To date, Defendant has neither adequately cured the engine defects, replaced the Defective Engines, or initiated a program providing for same.

79. Navistar was at all relevant times on notice of the engine defects through persistent, abnormal complaints and service requests it received from Class members as well as by repairs of the subject engines or components thereof it was aware, through its maintenance records, and through Navistar employees' communications.

80. As a result of Defendant's breach, Plaintiff suffered damages in the amount of the difference between the value of the vehicles equipped with the Defective Engines and the value of the vehicles if they had performed as warranted.

81. Plaintiff also suffered diminution in the value of its vehicles, out-of-pocket expenses related to the cost to repair/service the engines (including deductibles paid when repairs were covered by insurance, and the full cost of repair when they were not covered), lost profits from the inability to use the vehicles having the defective engine (including by long delays at Navistar-affiliated dealership mechanics that repeatedly, and unsuccessfully, attempted to diagnose the problem or repair chronic defects), towing

CLASS ACTION COMPLAINT

File # 7598.01

charges incurred due to the repeated breakdowns of the vehicles, the cost of purchasing additional vehicles caused by the unreliability of the MaxxForce 13-liter diesel engines, and other damages as described herein.

82.     Defendant Navistar's defective MaxxForce 13-liter diesel engine is the direct and proximate cause of Plaintiff's injuries.

83.     Plaintiff and the other Class Members are entitled to legal and equitable relief against Navistar, including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

COUNT THREE

DECLARATORY RELIEF REGARDING UNCONSCIONABILITY AND<br>UNENFORCEABILITY OF UNILATERALLY IMPOSED<br>DURATIONAL LIMITS TO NAVISTAR'S EXPRESS WARRANTY

84.     Plaintiff realleges and incorporates by reference paragraphs 1–61as though fully set forth herein.

85.     The express MaxxForce 13-liter diesel engine warranty was unilaterally and solely drafted by Navistar without any negotiation or opportunity for input from Plaintiff or any Class Member.  All terms of the express warranty, including the unilaterally imposed durational limits of five years or 100,000 miles were offered by Navistar on a "take it or leave it" basis and without affording Plaintiff and Class Members any meaningful choice in bargaining for the terms of warranty coverage.

86.     Navistar, as the manufacturer of the Class vehicles, knew at the time that it unilaterally imposed the terms of its express warranty (including the warranty's durational limits), that its MaxxForce 13-liter diesel engine was defective and would fail repeatedly beyond the warranty repair period.  Navistar also knew, at the time that it

CLASS ACTION COMPLAINT
 File # 7598.01

unilaterally imposed the durational limits on its express warranty, that Navistar was unqualified and unable to perform properly the warranty services that it had contracted to offer as part of the MaxxForce 13-liter diesel engine warranty, thereby leaving the Class vehicles defective both within and outside the warranty durational limits unilaterally imposed by Navistar. Defendant also failed to disclose this knowledge to any Class Member and took affirmative steps to conceal it by continuing to tout the supposed superior attributes and qualities of the MaxxForce 13-liter diesel engine.

87. As a result of Navistar's knowledge and concealment from consumers of the defects inherent in the subject engines, their propensity to fail shortly after the warranty durational limits would expire, and Navistar's inability to offer appropriate warranty repair service as was called for under the terms of the express warranty, Navistar was the party with superior bargaining power.

88. Navistar has and continues to adhere to the durational limits of its express warranty and relies upon these unilaterally imposed durational limits to deny warranty coverage to any Class vehicle that is presented for warranty repair service either more than five years since its in-service date or having more than 100,000 miles. All Plaintiff has is either Navistar deny warranty service to its vehicles as a result of these unilaterally imposed durational limits, or face the certain prospect of Navistar denying warranty coverage to its vehicles once these durational limits have been reached.

89. Given that (1) there was no opportunity for bargaining the terms of the warranty (including its durational limits); (2) Navistar concealed, during the transactions giving rise to the offering of the express warranty, Navistar's unique and superior knowledge as to the defective nature of the Class vehicles, their propensity to fail shortly

31

after the durational limits, and Navistar's inability to offer adequate warranty repair service; and (3) Plaintiff and Class Members had no meaningful choice but to accept Navistar's unilaterally imposed warranty terms, the durational limits imposed unilaterally by Navistar as part of its warranty contract are procedurally unconscionable and hence unenforceable.

90.     Given the inherently defective nature of the Class vehicles, and their propensity to malfunction (or continue to malfunction) and require inordinately expensive repairs shortly after the expiration of the warranty duration limits unilaterally imposed by Navistar, and given Defendant's non-disclosure and affirmative concealment of these facts, enforcement of the unilaterally imposed durational limits of the MaxxForce 13-liter diesel engine express warranty would so oppress and surprise the innocent end-user members of the Class as to render these durational limits substantively unconscionable and hence enforceable.

91.     Because all Class Members are subject to these same unilaterally imposed durational limits, and all either have been denied warranty coverage by Navistar as a result of these durational limits or face the certain prospect of such denial, a real controversy exists between all members of the Class and Navistar.  As such, Plaintiff and Class Members may and do seek a declaration of their rights and Defendant's obligations regarding the express warranty.  Specifically, all Plaintiff and Class Members seek a declaration by this Court that Navistar's unilaterally imposed durational limits on its MaxxForce 13-liter diesel engine express warranty are unconscionable and hence unenforceable, such that Defendant may not enforce or rely on these durational limits as a basis to deny warranty coverage to Class Members or their successors or assignees in the

CLASS ACTION COMPLAINT
File # 7598.01

future.

92.     Because Navistar's continued enforcement of these unconscionable durational limits to the subject engine's warranty would cause Class Members to sustain irreparable harm, all Plaintiff and Class Members have standing to and do seek an injunction barring Navistar from continuing to enforce the durational limits and relying on these unconscionable limits to deny warranty coverage.

**COUNT FOUR**

**<u>VIOLATION OF ILLINOIS CONSUMER FRAUD ACT, 815 Ill. Comp. Stat. 505/2</u>**

93.     Plaintiff incorporates the allegations set forth above in paragraphs 1–61 as if fully set forth herein.

94.     Illinois prohibits:

> [u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965,[1] in the conduct of any trade or commerce.

815 Ill. Comp. Stat. 505/2.

95.     Plaintiff and Class Members are consumers who purchased or leased one or more Navistar ProStar® tractor-trailer trucks equipped with Defective Engines.

96.     Navistar is an entity whose conduct, as set forth herein, occurred in the conduct of trade or commerce.

97.     At all relevant times, as described above, the Navistar ProStar® vehicles equipped with the Defective Engines that Defendant sold to Plaintiff and Class Members were not of the particular sponsorship, approval or certification because the vehicles

CLASS ACTION COMPLAINT
File # 7598.01

contained Defective Engines, causing the likelihood of confusion and misunderstanding repair and sustained non-operability and resultant loss of profits.

98.    By failing to disclose the defects inherent to the subject engine and failing to properly repair the Defective Engines, Navistar engaged in unfair or deceptive acts or practices including (1) representing that Navistar ProStar® vehicles equipped with MaxxForce 13-liter diesel engines have characteristics, use benefits and qualities which they do not have; (2) representing that Navistar's ProStar® vehicles equipped with the Defective Engines are of a particular standard, quality and grade when they are not; (3) advertising Defendant's vehicles equipped with the Defective Engines with the intent not to sell them as advertised; (4) representing that a transaction involving Navistar vehicles equipped with Defective Engines confers or involves rights, remedies and obligations which it does not; (5) representing that the subject of a transaction involving Defendant's vehicles equipped with the Defective Engines has been supplied in accordance with a previous representation when it has not; and (6) representing that the Navistar ProStar® vehicle equipped with the Defective Engines had sponsorship, approval, characteristics, ingredients, uses and benefits that they do not have.

99.    Navistar sold the vehicles equipped with the defective subject engines to Plaintiff and Class Members with full knowledge that the vehicles contained the Defective Engines at issue in this litigation.

100.    Navistar intended that Plaintiff and Class Members rely on its misrepresentations and omissions so that Plaintiff and Class Members would purchase ProStar® vehicles equipped with the Defective Engines.

101.    Navistar owed Plaintiff and Class Members a duty to disclose the defects

in the ProStar® vehicles equipped with the defective subject engines because it possessed exclusive and superior knowledge of the defects and did not disclose these defects.

102.    Information regarding these defects, which resulted in substantial additional repair costs, decreased vehicle performance and/or vehicle failure is material to a reasonable consumer in deciding to purchase a vehicle and considering how much to pay for a vehicle.

103.    A reasonable consumer who had known of the defective nature of the subject engines would not have purchased Navistar ProStar® tractor-trailer trucks equipped with the subject engine or would have paid less for them.

104.    Navistar's unfair and deceptive acts or practices were therefore likely to or had a tendency or capacity to deceive reasonable consumers about the true nature of the ProStar® vehicles equipped with the subject engines.

105.    Navistar's unfair and deceptive acts or practices offended public policy, were immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to consumers.

106.    Navistar's actions impact the public interest because Plaintiff and Class Members were injured in exactly the same way as thousands of others who purchased and/or leased Navistar ProStar® vehicles equipped with the Defective Engines as a result of and pursuant to Defendant's generalized course of deception.

107.    Navistar's conduct was knowing, intentional and with malice, and demonstrated complete carelessness and recklessness and was in conscious disregard for the rights of Plaintiff and Class Members.

108.    As a result of the foregoing acts and omissions, Navistar violated the

CLASS ACTION COMPLAINT

File # 7598.01

consumer fraud acts of all jurisdictions, and Plaintiff and Class Members suffered actual damages as described here.  Plaintiff and these Class Members are entitled to recover such damages, together with punitive damages, equitable relief, injunctive relief, diminution of value, reasonable attorneys' fees, costs of suit, and such other relief a set forth below.

## X.  DAMAGES

109.    Plaintiff incorporates the allegations set out above as though fully set forth herein.

110.    Plaintiff would further show that as a result of the acts and/or omissions of Navistar, Plaintiff has suffered and continues to suffer at least the following damages for which Plaintiff now sues:

a.    Out-of-pocket damages for expenditures related to the cost to repair/service the engines;

b.    Deductibles paid when repairs were covered by warranty;

c.    Towing charges incurred from having incapacitated vehicles towed in for repair;

d.    Lost profits from the inability to utilize vehicles equipped with said engine, due to the engine being inoperable, the vehicle being stored at a Navistar dealership awaiting a Navistar authorized mechanic to repair it, or the vehicle being insufficiently reliable to be put into service;

e.    Cost to overhaul and/or replace the engine in all vehicles equipped with MaxxForce 13-liter diesel engines;

f.    Diminution in value of the vehicles attributable to the defect;

g.    Decreased value received for vehicles, as a result of the defect, when trading in or selling the vehicle;

h.    Increased equipment expenses caused by the need to purchase additional vehicles to keep in reserve (due to the unreliability of the MaxxForce 13-liter diesel engine and the fact that units spend a large amount of time incapacitated awaiting repair at Navistar dealerships);

CLASS ACTION COMPLAINT

File # 7598.01

      i.       Increased salary expenses caused by the need to hire additional mechanics to deal with the repeated problems with the MaxxForce 13-liter diesel engine; and

      j.       Increased expenses caused by the need to keep additional tools and parts on hand to deal with the repeated problems with the subject engine.

111.    The damages set forth above are sought by Plaintiff and Class Members from and against Defendant.

WHEREFORE, Plaintiff prays for judgment against Defendant, Navistar, Inc., for past and future economic losses, declaratory and injunctive relief, reasonable attorneys' fees, pre- and post-judgment interest, costs, equitable relief, and such other relief the Court may deem just and proper.

## XI.    <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

Respectfully submitted,

FINKELSTEIN & KRINSK LLP

Dated July 7, 2014              By:   /s/ Jeffrey R. Krinsk            
                                       Jeffrey R. Krinsk, Esq.
                                         jrk@classactionlaw.com
                                       Mark L. Knutson, Esq.
                                       mlk@classactionlaw.com
                                       501 West Broadway, Suite 1250
                                       San Diego, CA 92101-3593
                                       Telephone:  (619) 238-1333
                                       Facsimile:  (619) 238-5425

*Counsel for Plaintiff Par 4 Transport, LLC*

*(Pro Hac Vice Application Pending)*

CLASS ACTION COMPLAINT
File # 7598.01